IN THE UNITED STATED DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MELVIN PELL and ELLEN PELL,     )
                                )
            Plaintiffs,          )
                                )
    v.                          )
                                )   Civil Action No. 02-21 KAJ
E.I. DUPONT DE NEMOURS &        )
COMPANY INCORPORATED, et al.,   )
                                )
            Defendants.         )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Robert Jacobs, Esq., Jacobs & Crumplar, P.A., 2 East 7th Street, P.O. Box 1271, Wilmington, Delaware 19899; Counsel for Plaintiff.

Kathleen Furey McDonough, Esq., Sarah Elizabeth DiLuzio, Esq., Potter Anderson & Corroon, LLP, 1313 North Market Street, P.O. Box 951, Wilmington, Delaware 19899; Counsel for Defendants.

October 6, 2006
Wilmington, Delaware



JORDAN, District Judge

## I.    INTRODUCTION

Plaintiffs Melvin Pell and Ellen Pell, his wife, (collectively, "Plaintiffs") filed a

complaint against Mr. Pell's former employer E.I. du Pont de Nemours & Co. Inc., a

Delaware corporation, and the Board of Benefits and Pensions of E.I. du Pont de

Nemours & Co. Inc. ("the DuPont Board") (collectively "DuPont") alleging that DuPont

breached its duties, obligations, and fiduciary responsibilities under Section 502 of the

Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132.  Plaintiffs

allege that DuPont breached its fiduciary responsibilities by calculating Mr. Pell's

benefits under the DuPont pension plan based on a later date than the commencement

of his employment with Consolidated Coal Company ("Consol"), a DuPont subsidiary.[1]

DuPont had misrepresented on several occasions over the course of Mr. Pell's

employment that it would use an earlier employment-commencement date in

calculating his pension.  (D.I. 173 at ¶ 30.)

Plaintiffs assert that, in accepting an opportunity to transfer Mr. Pell's

employment from Consol to DuPont,  they detrimentally relied on a letter dated January

13, 1984 from Mr. William Waddell, Director of Employee Compensation and Benefits

at Consol (the "Letter") that misrepresented the date from which his credited

employment would be calculated for pension purposes.  (D.I. 174 at ¶ 2.)  The plaintiffs

also claim they relied on several informal conversations Mr. Pell had with DuPont

management in making a decision to transfer permanently to DuPont.  (Trial Transcript

---

[1] Consol is no longer a subsidiary of DuPont, but was at the time Mr. Pell
became a DuPont employee.  (Docket Item ["D.I."] 5  at ¶ 6.)

1

["Tr."] at A-25:17-27:25.)  Plaintiffs allege that DuPont, through its pension and human

relations personnel, continued to misrepresent to Mr. Pell from 1984 through December

2000 that it would use an earlier employment-commencement date, and that these

repeated misrepresentations over many years create extraordinary circumstances that

should allow recovery under ERISA of the full benefits Plaintiffs anticipated.  (D.I. 174 at

¶ 14-17).  Plaintiffs seek an injunction to compel DuPont to use the earlier date in

calculating Mr. Pell's benefit rights under the pension plan.  (*See* D.I. 175 at ¶ 14.)

Plaintiffs also seek restitution stemming from what they claim is the unfairly low

calculation of Mr. Pell's retirement benefits.  (*Id.*)

Defendants argue that Plaintiffs are receiving all the benefits due to them under

the terms of the DuPont Pension and Retirement Plan (the "DuPont Plan") and certain

administrative guidelines in force at the time of Mr. Pell's transfer to DuPont (the

"Transfer Policy"), that Plaintiffs have failed to establish that Mr. Waddell acted with

apparent authority to speak for DuPont, and that Plaintiffs' equitable estoppel claim fails

as a matter of law.  (D.I. 173 at 1.)  Defendants also argue that the relief Plaintiffs seek

is precluded under ERISA because it is not equitable in nature.  (D.I. 173 at ¶¶ 19-29.)

This case was tried before me on March 27-28, 2006.[2] Following are my findings of fact and conclusions of law, issued pursuant to Federal Rule of Civil Procedure 52(a). For the reasons that follow, I conclude that Plaintiffs have succeeded, under an equitable estoppel theory of relief, in establishing that DuPont made material misrepresentations, that Plaintiffs reasonably and detrimentally relied upon those misrepresentations, and that extraordinary circumstances exist to warrant relief. I also conclude that Plaintiffs' request for restitution for unduly low pension payments already made to Mr. Pell is not permitted under ERISA § 502(a)(3), but an injunction to compel DuPont to recognize and use August 1, 1972 in calculating Mr. Pell's future benefits under the pension plan from this time forward is appropriate.

## II.    FINDINGS OF FACT[3]

1.    On February 10, 1971, Melvyn Pell was hired by Consol to work in Pittsburgh, Pennsylvania. (Uncontroverted Facts, D.I. 161 at ¶ III.1.)

---

[2]  I had earlier entered an Order and supporting Memorandum Opinion granting Defendant's Motion for Summary Judgment, holding that Plaintiffs did not have sufficient evidence to establish that DuPont should be equitably estopped from calculating Mr. Pell's pension based on a later start date. (D.I. 136 at 12-18.) Plaintiffs then filed a Motion for Reconsideration, (D.I. 137), pursuant to Federal Rule of Civil Procedure 59(e). Based on additional evidence highlighted by Plaintiffs, I granted their Motion for Reconsideration, finding that Plaintiffs had established that genuine issues of material fact existed as to whether Mr. Waddell acted with apparent authority from DuPont and whether Plaintiffs reasonably and detrimentally relied upon the Letter such that DuPont should be equitably estopped from asserting a different start date upon which to calculate Mr. Pell's pension benefits. (D.I. 137 at 17.)

[3]  Throughout these Findings of Fact ("F.F.") and Conclusions of Law ("C.L."), I may have adopted without attribution language suggested by one side or the other in this dispute. In all such instances, the finding or conclusion in question has become my own, based upon my review of the evidence and the law. To the extent that any of my findings of fact may be considered conclusions of law or vice versa, they are to be considered as such.

3

2.      At the time, Consol was a wholly-owned subsidiary of Conoco, Inc. ("Conoco"). (*Id.* at ¶ III.2.)

3.      Pursuant to the terms of the Consol Pension Plan in place at the time of Mr. Pell's employment with Consol (the "Consol Plan"), Mr. Pell did not become eligible to participate in the Consol Plan until the first day of the month following his thirtieth birthday. (Tr. A-45:3-15.) Accordingly, under the Consol Plan, Mr. Pell's Credited Service Date for purposes of his pension benefit calculation was August 1, 1972. (*Id.*; Joint Exhibit ["JX"] 9.)

4.      In 1981, Conoco (and consequently its subsidiary, Consol) was merged with DuPont.[4] (Uncontroverted Facts, D.I. 161 at ¶ III.3.)

5.      In 1982, Mr. Pell was offered an assignment to work for DuPont in Wilmington, Delaware although he would remain a Consol employee and continue receiving his salary and benefits from Consol. (Uncontroverted Facts, D.I. 161 at ¶ III.4.)

6.      Mr. Pell agreed to accept the assignment with DuPont and moved with his family from Pittsburgh, Pennsylvania to Wilmington, Delaware. (Uncontroverted Facts, D.I. 161 at ¶ III.5; Tr. A-202:10-11.)

7.      Mr. Pell worked as a Consol employee on loan to DuPont in Wilmington for more than a year. (Uncontroverted Facts, D.I. 161 at ¶ III.7.)

---

[4] The parties have stipulated to this fact and I accept it, although it appears to be a loose use of the word "merged," since Consol retained a separate corporate identity. (*See, e.g.*, F.F. at ¶¶ 5, 17.)

4

8.      In late 1983, Mr. Ray McCartney, a DuPont employee and Mr. Pell's manager, approached Mr. Pell to solicit his permanent transfer from Consol to DuPont. (Uncontroverted Facts, D.I. 161 at ¶ III.8 & 9.)

9.      Mr. and Mrs. Pell testified that they had several concerns about relocating permanently from their home in Pennsylvania to Wilmington, Delaware, including their perceptions of the quality of the schools in Wilmington compared to the quality of schools their children attended in Pennsylvania, the higher cost of living in Wilmington, and the separation from long-term friends they would leave behind. (Tr. at A-67:17-25; Tr. at A-202:15-25.) Mr. Pell testified that he knew that transferring to DuPont would mean a lower salary (Tr. at A-26:17-21), because oil companies, like Conoco/Consol, were known to pay engineers higher salaries than did chemical companies, like DuPont. (Tr. at A-26:24-27:1.) He was informed explicitly that if he transferred to DuPont, "some of [his] raises would suffer as [DuPont] adjusted [him] into the DuPont salary arrangements." (Tr. at A-26:18-21; *see also* Tr. at A-29:19-30:1.) Dr. Francis Tannian, an economist, testified that oil companies paid engineers better than chemical companies did during the period Mr. Pell worked at DuPont (Tr. at A-130:1-3), and that Mr. Pell "was gaining pay at a rate of a third as high with DuPont as he had gained with Consol." (Tr. at A-130:8-14.) Despite the diminution in salary he would receive at DuPont, Mr. Pell understood that DuPont's pension plan was significantly better than Consol's, which would offset the financial loss his family would incur because of the lower salary. (Tr. at A-28:8-10; A-204:12-17.)

10.     Mr. Ray Miller, another DuPont employee and Mr. Pell's first line supervisor in 1983, recalled that Mr. Pell's most important concern in considering

5

whether or not to transfer from Consol to DuPont was not having a break in the service

with which he would be credited when his pension was calculated.  (Tr. at A-84:4-14.)

      11.    Mr. Pell testified that, in making the decision to transfer to DuPont, he

relied on the oral representations of Mr. Miller and Mr. McCartney that his Consol

service time would be transferred over to the DuPont pension plan.  (Tr. at A-25:17-

27:25.)

      12.    On or about January 13, 1984, Mr. Pell received the Letter from Mr.

Waddell, the Director of Employee Compensation and Benefits at Consol, discussing

his potential transfer.  (Uncontroverted Facts, D.I. 161 at ¶ III.19; Tr. at A-30:12-15; JX

8.)

      13.    The Letter indicated that it was copied to various DuPont personnel.

(Uncontroverted Facts, D.I. 161 at ¶ III.12; JX 8.)

      14.    The Letter listed Mr. Pell's "Retirement Plan Credited Service Date" as

August 1, 1972, which was the date that Consol recognized as the start date for the

calculation of Mr. Pell's pension under the Consol Plan.  (JX 8; Tr. at A-45:3-15.)  The

Letter stated that Mr. Pell's transfer to DuPont would "not be considered a termination of

employment for retirement purposes" and the pension Mr. Pell would receive upon

retiring would be "calculated under the DuPont Plan based on [Mr. Pell's] total combined

service."  (JX at 8.)

      15.    Mr. Pell did not accept the permanent transfer, nor did he sign the relevant

new hire paperwork, until after he received the Letter.  (Tr. at A-30:16-20.)

      16.    Ultimately, Mr. Pell accepted the transfer to DuPont, effective January 1,

1984.  (Uncontroverted Facts, D.I. 161 at ¶ III.18.)  His decision to accept the transfer

was based upon the assurances he had received orally and in the Letter that his credited service date was August 1, 1972, which "reassured [him] on the points [he] had questioned. (Tr. at A-26:7-10; Tr. at A-13-18; Tr. at A-30:16-20.)

      17.    The DuPont Board and the DuPont Employee Relations Department adopted guidelines to assist management in administering compensation and benefits in connection with the permanent transfers of employees between Conoco, including Consol, and DuPont. (JX 2 ["Guidelines"].) Mr. Paul M. Herron, Supervisor of the Gross Control Salary Group within the Payroll Section of Employee Compensation Benefits Division in the Finance Department of Dupont in 1983, testified that the Guidelines reflected the input of Consol and Conoco (Tr. A-7:10-15), and were followed by all three entities when effecting permanent transfers. (Tr. A-7:16-19.) Similar guidelines were issued by Conoco Human Resources personnel. (JX 2 at D000019.) The Guidelines contained a typical letter that an employee permanently transferred from DuPont to Conoco/Consol would receive. (*Id*. at D000040.) The Guidelines further stated that when DuPont was receiving a transferred employee, Conoco/Consol would furnish a similar letter to the transferred employee and to the appropriate benefits administrator at DuPont in Wilmington, indicating the employee's years of service, adjusted service date, beneficiary designations, creditable service, and eligibility for and participation in benefit plans. (*Id*. at D000057-58; Tr. A-7:20-8:3.) The sample letter affirmatively stated that the receiving company "will recognize [the employee's] service to the same extent that [the sending company] recognized it at the time of transfer. This service will be used for eligibility, vesting and benefit computation in the [receiving company's] benefit plans."

(JX 2 at D000041.)  It then recommended that the sending company list the employee's adjusted service date used for benefit purposes.  (*Id.*)

18.    Mr. Herron stated that Mr. Waddell was the type of Consol employee authorized to write a transfer letter to DuPont and to a transferring employee (Tr. A-17:16-24), giving the information which was the basis for entering the new employee on DuPont's records.  (Tr. A-11:5-10.)  Mr. Herron stated that he would have regarded Mr. Waddell's Letter as "valid" and "reasonable and appropriate" (Tr. A-14:23-15:3) and that the January 13, 1984 Letter "followed the guidelines very closely." (Tr. A-9:21-10:13.) Mr. Herron also testified that he believed that he received the Letter in the ordinary course of his position.  (Tr. A-11:19-22.)

19.    Mr. Pell enjoyed a successful career at DuPont, during which he received regular salary increases, variable compensation awards, and several promotions.  (Tr. A-68:9-25; Tr. A-111:9-112:12; Tr. A-39:15-25.)  During his career with DuPont, Mr. Pell also wrote books and articles and achieved the honor of being named a fellow to the American Institute of Chemical Engineers.  (Tr. A-111:9-112:12.)  In sum, Mr. Pell was a good employee and was viewed within DuPont as a "high performer."  (Tr. A-95:21-A-96:2.)

20.    Mr. Pell testified that he received a document in 1991 indicating that his adjusted service date was 1975.  (Tr. A-31:22-32:5.)  He became concerned and requested from Ms. Doris Uhde, a pre-retirement counselor for DuPont, clarification on what date DuPont would use as his adjusted service date.  (Tr. A-167:7-24; JX 11.)  Ms. Uhde stated that his adjusted service date was "2/10/71, not 1975 and Du Pont [would] use this date for [Mr. Pell's] years of service under their formula when calculating [Mr.

8

Pell's] pension."[5]  (JX 11.)  Mr. Pell testified that, had he been told that 1975 was his pension date, he "probably would have gone out looking to whether [he] could return to [Consol] or find a better job that paid more or had a higher pension."  (Tr. A-33:14-22.)

21.    Mr. Pell requested in 1992 that DuPont prepare two estimates of his pension benefits for his use in retirement planning.  (JX 12 at 000029-30; Tr. A-34:7-12.) Both of these estimates stipulated February 10, 1971 as his adjusted service date.  (JX 12 at 000029-30.)  Mr. Pell again testified that, had he had been told that 1975 was his adjusted service date, he "would have gone looking for another job" and that he "would have had a good chance of being accepted back [at Consol]."  (Tr. A-35:15-25; A-36:14-17.)

22.    Mr. Pell requested another pension estimate in 1998.  (JX 13.)  Again, the pension estimate stipulated that Mr. Pell's adjusted service date was February 10, 1971. (*Id.*)  Mr. Pell testified that had he been told that his adjusted service date was 1975, he would have "probably retired and opened [his] own consulting business."  (Tr. A-40:1-8.)

23.    Mr. Pell received a benefit resources statement from DuPont in 1999 indicating that he had 28.5 years of service as of August 31, 1999, which was consistent with an adjusted service date of February 10, 1971.  (JX 10 at 000229.)  Mr. Pell testified

─────────────────────

[5]  The February 10, 1971 date differed from Mr. Pell's adjusted service date under the Consol Plan, which was August 1, 1972.  (JX 9.)  Under the Consol Plan, employees did not become eligible to participate in the Consol Plan until the first day of the month following an employee's thirtieth birthday.  (Tr. A-45:3-15.)  Under the DuPont Pension and Retirement Plan, "[a]ll full-service employees of DuPont are eligible to participate in the DuPont Pension and Retirement Plan beginning on the first day of DuPont employment."  (JX 3 at D000365.)

that if DuPont had told him that his adjusted service date was 1975, he "would have left the corporate entity and basically done [his] own consulting business." (Tr. A-41:15-21.)

24.     In August 2000, Mr. Pell began to make inquiries about his pension benefits under the DuPont Plan if he retired from DuPont on December 31, 2000. (Tr. at A-42:25-43:2; Tr. A-47:6-7.) DuPont had a difficult time figuring out how to calculate the pension benefits for which Mr. Pell would be eligible if he retired on that date, the difficulty being demonstrated by a series of e-mail exchanges over a four month period between Mr. Pell and Mr. Andrew Lesser, a DuPont Senior Pension Analyst. (Tr. A-44:9-15; Plaintiff's Exhibit ["PX"] 1.)

25.     On December 14, 2000, Mr. Lesser informed Mr. Pell by e-mail that DuPont planned to reduce Mr. Pell's years of recognized service by 1.475 years, which would change Mr. Pell's adjusted service date to August 1, 1972. (Tr. at A-44:20-45:8; PX 1 at 000017-18.) Mr. Pell believed that was a mistake and told Mr. Lesser so, requesting his help to resolve the matter. (PX 1 at 000017.) Mr. Lesser responded by informing Mr. Pell that, under the DuPont Plan, DuPont agreed to recognize Mr. Pell's Consol service "to the extent that it was recognized by Consol." (PX 1 at 000016.) On December 15, 2000, Mr. Pell sent another e-mail to Mr. Lesser, explaining that previous documentation he received from DuPont consistently[6] had used February 10, 1971 as Mr. Pell's adjusted service date, the date on which he began working for Consol. (PX 1 at 000007.) Mr. Pell also explained that Consol did not permit an employee to become

_____

[6] This was not entirely accurate. As noted earlier (F.F. at ¶¶ 3, 20 n.5), the Consol Plan provided Mr. Pell's adjusted service date to be August 1, 1972, and that date was the one used in the Letter Mr. Pell depended upon when deciding to move from Consol to DuPont. (F.F. at ¶ 16.)

eligible to participate in the Consol Plan until the employee's thirtieth birthday, but that DuPont did not have such a requirement under the DuPont Plan.  (*Id.*)  Mr. Pell requested that Mr. Lesser "reconsider the interpretation of [Mr. Pell's] adjusted service date to include all years of service" and that the "reduction of actual service by 1.5 years [was] a departure from previous interpretations." (*Id.*)

26.     On December 19, 2000, Mr. Lesser provided Mr. Pell with a final pension estimate, which consisted of:  (1) a pension benefit under the Consol Plan based on his credited service at Consol, commencing August 1, 1972 and ending December 31, 1983, and (2) a DuPont pension benefit based on credited service commencing November 1, 1975 and ending on his proposed retirement date from DuPont, offset by the payments under the Consol Plan based on his Consol credited service from November 1, 1975 through December 31, 1983.  (PX 1 at 000041; Tr. A-46:8-19.)  Mr. Pell responded to Mr. Lesser in an e-mail on December 20, 2000, stating that DuPont had "now removed 5 years or $750/month from my pension compared to every estimate ever provided by DuPont including my benefits estimate of 8/99." (PX 1.)  Mr. Pell informed Mr. Lesser that DuPont had "thoroughly thrown my retirement plans into disarray," and that Mr. Pell would be informing his supervisor that he would not be able to retire on December 31, 2000 as he had previously scheduled.  (*Id.*)  Mr. Pell also requested from Mr. Lesser information on the appeals procedure, stating that he would "try to act on it as soon as possible."  (*Id.*)

27.     Mr. Pell challenged this benefit calculation and initiated an appeal to the DuPont Board.  (Uncontroverted Facts, D.I. 161 at ¶ III.16.)

11

28.    The DuPont Board upheld the determination of Mr. Pell's benefit under the terms of the Consol Plan, the DuPont Plan, and the Transfer Guidelines. (Uncontroverted Facts, D.I. 161 at ¶ III.39.)

29.    Mr. Pell did receive pension benefits in the form of a lump sum from Consol for his period of employment with Consol.  (Uncontroverted Facts, D.I. 161 at ¶ III.17-18.)  In addition, Mr. Pell is receiving some further unspecified benefit related to his service with Consol.  (*Id.* at ¶ 17.)

30.    During the pendency of his appeal to the DuPont Board, Mr. Pell delayed his retirement until May 31, 2001.   (Uncontroverted Facts, D.I. 161 at ¶ III.15.)

## III.    CONCLUSIONS OF LAW

1.    Jurisdiction over the subject matter of this action is proper under 28 U.S.C. § 1331.

2.    Section 502(a)(3) of ERISA permits a beneficiary "to obtain. . .appropriate equitable relief. . .to redress [ERISA] violations or. . .to enforce any provisions of [ERISA] or the terms of the plan." 29 U.S.C. 1132(a)(3).  In *Gridley v. Cleveland Co.*, 924 F.2d 1310, 1319 (3d Cir. 1991), the United States Court of Appeals for the Third Circuit held that section 502 permits an ERISA beneficiary to recover benefits under an equitable estoppel theory.  *See also Curcio v. John Hancock Mut. Life Ins. Co.*, 33 F.3d 226, 235 (3d Cir. 1994) (holding that an employer can be liable under ERISA in its fiduciary capacity for making affirmative representations, such liability being based upon breach of fiduciary duty or equitable estoppel theories.)  "To succeed under [an equitable estoppel] theory of relief, an ERISA plaintiff must establish (1) a material

12

representation, (2) reasonable and detrimental reliance upon the representation, and (3)

extraordinary circumstances." *Curcio,* 33 F.3d at 235 (internal citations omitted).[7]

      *A.*    *Material Representation*

      3.     Plaintiffs must show that Mr. Pell relied upon material representations, or,

in this case, material misrepresentations, made by DuPont.  The Third Circuit has held

that a "misrepresentation is material if there is a substantial likelihood that it would

mislead a reasonable employee in making an adequately informed decision. . . ."

*Fischer v. Philadelphia Elec. Co.*, 994 F.2d 130, 135 (3d Cir. 1993); *see also Curcio*, 33

F.3d at 237.  In this case, DuPont's multiple oral and written representations that Mr.

Pell's benefits would be based on a February 10, 1971 or August 1, 1972 adjusted

service date (*see* F.F. at ¶¶ 11-16, 20-23) are material.  Mr. Pell testified that he did not

make the decision to transfer to DuPont, nor did he sign the relevant new hire

paperwork, until after he received Mr. Waddell's Letter, which "reassured [him] on the

points [he] had questioned."[8]  (F.F. at ¶ 16; Tr. at A-30:16-20.)  Mr. Pell weighed the pros

and cons of transferring to DuPont, taking several factors into consideration.  (F.F. at ¶

9; Tr. at A-28:1-14.)  He knew that transferring to DuPont would mean a lower salary

(F.F. at ¶ 9; Tr. at A.26:17-21), but he also understood that DuPont's pension plan was

significantly better.  (F.F. at ¶ 9; Tr. at A-28:8-10.)  Losing time credited towards a

---

     [7] In their Responding Post Trial Findings of Fact and Conclusions of Law,
Plaintiffs also assert that DuPont breached its fiduciary duty to Mr. Pell under ERISA §
502(a)(3)(B), 29 U.S.C. § 1132(a)(3)(B) (2000).  (D.I. 175 at 16-22.)  Because DuPont
did not have an opportunity to respond to Plaintiffs' assertions, I do not address that
argument.

     [8] As discussed herein (C.L. ¶¶ 8-11), I have concluded that Mr. Waddell's
representations are binding upon DuPont.

pension benefit would mean receipt of a lower benefit,[9] a factor that clearly would be important to a reasonable employee in making an informed decision on whether or not to transfer to DuPont.

4.      In addition, the representations DuPont made over several years indicating that Mr. Pell's service date for purposes of calculating his pension benefit was February 10, 1971 were material. Mr. Pell testified that if he had been told that 1975 was his adjusted service date, he "would have gone looking for another job" and that he "would have had a good chance of being accepted back [at Consol]." (Tr. A-35:15-25; A-36:14-17; see also Tr. A-33:14-22; A-40:1-8; A-41:15-21.) Losing credit towards a pension plan would be important to a reasonable employee in making an informed decision on whether to continue working for the same company, retire early, or look for alternative employment. See Fischer, 994 F.2d at 135 (finding that a "misrepresentation is material if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision about if and when to retire.")

B.      Reasonable and Detrimental Reliance

1.      Mr. Pell's Reliance on Informal Conversations with DuPont Management and Mr. Waddell's Letter.

5.      Plaintiffs must demonstrate reasonable and detrimental reliance upon the representations that DuPont made. In Smith v. Hartford Ins. Group, 6 F.3d 131 (3d Cir.

_____

[9] Under the DuPont Plan, DuPont uses three formulas to calculate an employee's monthly pension. It ultimately utilizes the formula that yields the highest monthly pension for the employee, as long as the monthly pension does not exceed the employee's average monthly pay. (JX 3 at D000367.) Each of these formulas uses the length of service of employees as part of the computation formula, defined as "continuous service," or "the time elapsed since [the employee's] date of hire (or rehire) including any prior service which has been restored." (Id. at D000368.)

14

1993), one of the plaintiffs suffered a cerebral hemorrhage and, as a result, required continuous care in a skilled nursing facility. *Id.* at 133. She was covered by her employer's group health insurance policy, but her employer changed its group health policy to a self-insured plan while she was still recovering from her injury. *Id.* Her husband, on her behalf, enrolled in the new plan based on the employer's erroneous oral and written representations that she would receive the same level of nursing coverage. *Id.* at 133-134. After the plaintiffs were denied coverage under the insurance policy, they brought suit, claiming that, were it not for the employer's misrepresentations, they could have converted to an individual policy in order to retain the skilled nursing care coverage provided by the former policy. *Id* at 137. The Court held that a fact finder could find that the plaintiffs "reasonably and detrimentally relied on" the employer's continued misrepresentations. *Id.* at 140.

6.    Similar to the facts in *Smith*, Plaintiffs here detrimentally relied on DuPont's repeated and erroneous oral and written representations. Mr. and Mrs. Pell testified that they had several concerns about relocating permanently from their home in Pennsylvania to Wilmington, Delaware, including their perceptions of the quality of the schools in Wilmington compared to the quality of schools their children attended in Pennsylvania, the higher cost of living in Wilmington, and the separation from long-term friends they would leave behind. (F.F. at ¶ 9; Tr. at A-67:17-25; Tr. at A-202:15-25.) Mr. Pell testified that he knew that transferring to DuPont would mean a lower salary (F.F. at ¶ 9; Tr. at A-26:17-21), as oil companies paid engineers higher salaries than chemical companies did. (F.F. at ¶ 9; Tr. at A-26:24-A-27:1.) He explicitly was informed that if he

15

transferred to DuPont, "some of [his] raises would suffer as [DuPont] adjusted [him] into the DuPont salary arrangements." (F.F. at ¶ 9; Tr. at A-26:18-21; *see also* Tr. at A-29:19-A-30:1.) Dr. Francis Tannian, an economist, testified that oil companies paid engineers better than chemical engineers during the period Mr. Pell worked at DuPont (F.F. at ¶ 9; Tr. at A-130:1-3), and that Mr. Pell "was gaining pay at a rate of a third as high with DuPont as he had gained with Consol." (F.F. at ¶ 9; Tr. at A-130:8-14.) Despite the diminution in salary he would receive at DuPont, Plaintiffs understood that DuPont's pension plan was significantly better than Consol's, which would offset the lower salary. (F.F. at ¶ 9; Tr. at A-28:8-10; A-204:12-17.)

7.      Mr. Pell testified that, in making the decision to transfer to DuPont, he relied on the oral representations of Mr. Miller and Mr. McCartney that his Consol service time would be transferred over to the DuPont pension plan. (F.F. at ¶ 11; Tr. at A-25:17-27:25.) Mr. Miller, Mr. Pell's first line supervisor in 1983, recalled that Mr. Pell's most important concern in considering whether or not to transfer from Consol to DuPont was not having a break in the time that would be credited as service toward his pension. (F.F. at ¶ 10; Tr. at A-84:4-14.) The Letter Mr. Pell received from Mr. Waddell listed Mr. Pell's "Retirement Plan Credited Service Date" as August 1, 1972. (F.F. at ¶ 14; JX 8; Tr. at A-45:3-15.)   Mr. Pell testified that he did not make the decision to transfer to DuPont, nor did he sign the relevant new hire paperwork, until after he received the Letter, which "reassured [him] on the points [he] had questioned." (F.F. at ¶ 16; Tr. at A-30:16-20.) From these facts, I conclude that Mr. Pell detrimentally relied on these

16

erroneous oral and written representations in deciding to permanently transfer to

DuPont.[10]  The question then becomes whether or not that reliance was reasonable.

8.    Mr. Pell's reliance on those oral and written representations was

reasonable, considering the circumstances in which he found himself.  Although it may

not have been reasonable for Mr. Pell to rely solely on the informal conversations he had

with Mr. Miller and Mr. McCartney, those conversations in conjunction with the Letter he

received from Mr. Waddell provided a basis for reasonable reliance, since Mr. Waddell

acted with apparent authority from DuPont.

9.    Apparent authority "(1) 'results from a manifestation by a person that

another is his agent,' and (2) 'exists only to the extent that it is reasonable for the third

person dealing with the agent to believe that the agent is authorized.'" *Taylor v. Peoples

Natural Gas Co.*, 49 F.3d 982, 989 (3d Cir. 1995) (citation omitted).  When in late 1983

and early 1984 Mr. Pell considered transferring from Consol to DuPont, Consol was

effectively part of DuPont, having been a Conoco subsidiary when Conoco merged with

DuPont in 1981.  (F.F. at ¶¶ 2, 4; Uncontroverted Facts, D.I. 161 at ¶ III.2-3.)

Employees frequently made permanent transfers from Conoco/Consol to DuPont and

from DuPont to Conoco/Consol, as evidenced by the fact that DuPont created a

manuscript entitled "Guidelines for Administration of Compensation & Benefits for

Employees Permanently Transferred Between DuPont and Conoco/Consol."  (JX 2.)

The Guidelines, according to Mr. Herron, reflected the input of Consol and Conoco (F.F.

at ¶ 17; Tr. A-7:10-15), and were followed by all three entities when effecting permanent

---

[10] By focusing on Mr. Pell's state of mind, I do not intend to slight Mrs. Pell, whose reliance on the same information, as filtered through her husband, seems clear.

transfers.  (F.F. at ¶ 17; Tr. A-7:16-19.)  The Guidelines themselves state that "[s]imilar guidelines [were] issued by Conoco Human Resources personnel to cover Conoco employee benefits for transferred employees" and that the Guidelines would "assist management in informing employees being transferred to Conoco/Consol from DuPont." (F.F. at ¶ 17; JX 2 at D000019.)

10.    The Guidelines outlined a notification process to inform transferees of their benefit status.  (F.F. at ¶ 17; JX 2 at D000057.)  The sending company would furnish a letter to the transferring employee and the appropriate benefits administrator in the receiving company, indicating the employee's years of service, adjusted service date, beneficiary designations, creditable service, and eligibility for participation in benefit plans.  (F.F. at ¶ 17; JX 2 at D000056-57.)  Mr. Pell's Letter indicated that it was copied to Mr. Herron and to Mr. Roconni, the division head of Personnel and Employee Relations, among others.  (F.F. at ¶ 13; JX 8 at 000203.)

11.    I conclude that Mr. Waddell acted with apparent authority because DuPont manifested to Mr. Pell that Mr. Waddell was its agent, and it was reasonable for Mr. Pell to believe that Mr. Waddell was authorized to act on behalf of DuPont.  Mr. Pell received the Letter from Mr. Waddell, the Director of Employee Compensation and Benefits of his employer Consol (JX 8), which was owned and controlled by DuPont at the time Mr. Pell received the Letter.  In addition, Mr. Waddell, according to Mr. Herron and the Guidelines, was an "appropriate person to promulgate that information under the guidelines."  (F.F. at ¶ 18; Tr. A-17:16-24; PX 2 at D000058.)  The Letter indicated on its face that it had been copied to DuPont management, including the division head of Personnel and Employee Relation, and Mr. Herron testified that he believed that he

received the Letter in the ordinary course of his position.  (F.F. at ¶ 18; Tr. A-11:19-22.)

It was reasonable for Mr. Pell to understand that Mr. Waddell was communicating on

behalf of all the subparts of DuPont's corporate structure the information that DuPont

intended for him to act upon in deciding whether to accept a transfer.  It was reasonable

for him to expect under these circumstances that if the information he received was not

correct, DuPont would notify him.  In other words, DuPont manifested to Mr. Pell that Mr.

Waddell was its agent, both by the manner in which it chose to convey information

regarding how his pension would be calculated and by its not taking action to correct any

errors when it was clear to everyone that Mr. Pell had received such information from the

Director of Employee Compensation and Benefits of Consol, an entity under the ultimate

ownership and control of DuPont.

### 2.    Mr. Pell's Reliance on Estimates of Pension Benefits

12.    In addition, I find that Mr. Pell reasonably and detrimentally relied on the

informational statements estimating his pension benefits and showing February 10, 1971

as his service date for purposes of calculating his pension benefit.  Mr. Pell testified that,

when he received a document in 1991 indicating that his adjusted service date was 1975

(F.F. at ¶ 20; Tr. A-31:22-32:5), he became concerned and requested from Ms. Doris

Uhde, a pre-retirement counselor for DuPont, a clarification of the date used for the

calculation of his pension.  (F.F. at ¶ 20; Tr. A-167:7-24; JX 11.)  Ms. Uhde confirmed

that his adjusted service date was "2/10/71, not 1975 and Du Pont [would] use this date

for [Mr. Pell's] years of service under their formula when calculating [Mr. Pell's] pension."

(F.F. at ¶ 20; JX 11.)  Mr. Pell manifested detrimental reliance on DuPont's statements

by testifying that, had he been told that 1975 was his pension date, he "probably would

19

have gone out looking to whether [he] could return to [Consol] or find a better job that paid more or had a higher pension." (F.F. at ¶20; Tr. A-33:14-22.) Although DuPont points out that it utilized the adjusted service date "in certain respects in the calculation of [Mr. Pell's] pension benefit" by using the service date to determine Mr. Pell's years of service for eligibility and for vesting purposes (D.I. 173 at ¶¶ 41-42), this was not conveyed in any way to Mr. Pell. Ms. Uhde wrote that February 10, 1971 was the beginning date that would be used in DuPont's formula when calculating Mr. Pell's pension. (F.F. at ¶ 20; JX 11.) That explicit reassurance would convey to any reasonable employee that all the calculations, including and most especially the monthly pension amount, would use that date as the service date for his benefits, not just for eligibility and vesting purposes.

13. Mr. Pell requested in 1992 that DuPont prepare two estimates of his pension benefits for his use in retirement planning. (F.F. at ¶ 21; JX 12 at 000029-30; Tr. A-34:7-12.) Both of those estimates stipulated February 10, 1971 as his adjusted service date. (F.F. at ¶ 21; JX 12 at 000029-30.) Although the estimates contained clear warnings that the calculations were only estimates and not final calculations of Mr. Pell's pension benefits, it would be reasonable for Mr. Pell to rely upon DuPont again recognizing February 10, 1971 as his adjusted service date, particularly after DuPont, through Ms. Uhde, had expressly reassured Mr. Pell in 1991 about his service date. Mr. Pell testified that he detrimentally relied on this information, stating that had he been told that 1975 was his adjusted service date, he "would have gone looking for another job" and that he "would have had a good chance of being accepted back [at Consol]." (F.F. at ¶ 21; Tr. A-35:15-25; A-36:14-17.)

20

14.    Mr. Pell requested another pension estimate in 1998.  (F.F. at ¶ 22; JX 13.)

Yet again, the pension estimate stated that Mr. Pell's adjusted service date was

February 10, 1971.  (F.F. at ¶ 22; JX 13.)  Although this estimate again contained a

warning that the calculations were subject to review and correction, it was reasonable for

Mr. Pell to rely on this further confirmation of his service date, as DuPont had by that

time had seven years to correct the information given by Ms. Uhde after being put on

notice in 1991 that Mr. Pell was concerned about DuPont's position on his service date.

Mr. Pell testified that he detrimentally relied on this further confirmation of the February

10, 1971 date, stating that had he been told that his adjusted service date was 1975, he

would have "probably retired and opened [his] own consulting business."  (F.F. at ¶ 22;

Tr. A-40:1-8.)

15.    Finally, Mr. Pell reasonably relied on a benefit resources statement he

received from DuPont in 1999 indicating that he had 28.5 years of service as of August

31, 1999, which was consistent with an adjusted service date of February 10, 1971.

(F.F. at ¶ 23;  JX 10 at 000229.)  Mr. Pell testified that he detrimentally relied on this

information, saying that if DuPont had told him that his adjusted service date was 1975,

he "would have left the corporate entity and basically done [his] own consulting

business."  (F.F. at ¶ 23; Tr. A-41:15-21.)

16.    Given that DuPont knew Mr. Pell was concerned about the accuracy of his

adjusted service date and that DuPont repeatedly and over many years represented that

his service date was February 10, 1971, I conclude that Mr. Pell reasonably and

detrimentally relied on those representations of a pre-1975 service date.

21

C.    *Extraordinary Circumstances*

17.    Plaintiffs must demonstrate the existence of extraordinary circumstances. While that term has not been defined specifically by the Third Circuit in the context of ERISA disputes, a number of cases have helped to "establish its parameters." *Kurz v. Philadelphia Electric Co.*, 96 F.3d 1544, 1553 (3d Cir. 1996). As previously noted (C.L. at ¶ 5), the Court in *Smith v. Hartford Ins. Group*, 6 F.3d 131 (3d Cir. 1993), held that the fact finder could determine that extraordinary circumstances were established "in light of [the employer's] repeated oral and written misrepresentations to [Mr.] Smith [and] his diligence in attempting to obtain accurate answers regarding his wife's coverage." *Id.* at 142. Thus, repeated misrepresentations over an extended course of dealings between an employer and an employee are sufficient to demonstrate the existence of extraordinary circumstances, when, as here, it is clear that the employee has been diligent in inquiring into the employer's representations, in seeking clarifications about those representations, and in obtaining reaffirmations of those representations. As in *Smith*, Mr. Pell sought and received specific reassurances about the benefits now at issue. On several occasions he sought to obtain information regarding his correct adjusted service date for pension purposes (F.F. at ¶¶ 20-23; Tr. at A-25:17-27:25; A-167:7-24; A-34:7-12; JX 11; JX 12; JX 13), and each time his employer represented to him that his service date was years before 1975. (Tr. at A-25:17-27:25; JX 11; JX 12; JX 13.) Although Plaintiffs have not established that DuPont engaged in acts of bad faith, active concealment, or fraud, *Smith* holds that such deliberate acts are not necessary to establish extraordinary circumstances. Misrepresentations over an

22

extended course of dealings between an employer and employee, when the employee repeatedly and diligently seeks to obtain information, are sufficient to establish extraordinary circumstances.

D.    *Relief to Which Plaintiffs Are Entitled Under ERISA*

18.    An employer can be liable under ERISA in its fiduciary capacity for making affirmative misrepresentations, such liability being based upon equitable estoppel. *Curcio,* 33 F.3d at 235.  Section 502(a)(3) of ERISA permits a beneficiary "to obtain. . . appropriate equitable relief. . .to redress [ERISA] violations or. . .to enforce any provisions of [ERISA] or the terms of the plan."  29 U.S.C. 1132(a)(3).  The Supreme Court explained that the "equitable relief" available under 502(a)(3) means "*something less than all* relief."  *Mertens v. Hewitt Associates*, 508 U.S. 248, 258, n.8 (1993).  The Court concluded that Section 502(a)(3) refers to "those categories of relief that were *typically* available in equity. . . ."  *Id.* at 256.  Relief available under ERISA may include: "'accrued benefits due, a declaratory judgment on entitlement to benefits,. . .an injunction against a plan administrator's improper refusal to pay benefits,. . .and removal of the fiduciary,' but not. . . compensatory and punitive damages."  *Huss v. Green Spring Health Servs., Inc.*, 18 F. Supp. 2d 400, 408 (D. Del. 1998) (quoting *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 53 (1987)) (internal citations omitted).  In *Great-West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204 (2002), the Supreme Court interpreted *Mertens* to reject a reading of section 502(a)(3) that "would extend the relief obtainable under [the statute] to whatever relief a court of equity is empowered to provide in the particular case at issue (which could include legal remedies that would otherwise be

23

beyond the scope of the equity court's authority)." *Id.* at 210. The Supreme Court reaffirmed in *Great-West* that ERISA does not permit the award of compensatory or money damages. *See Great-West*, 534 U.S. at 209-10; *see also Mertens*, 508 U.S. at 255-56 (1993).

19.    Here, Plaintiffs seek relief in the form of an injunction for future benefits and restitution for unduly low pension payments already made to Mr. Pell. (D.I. 175 at ¶ 14.) I must now determine if the relief Plaintiffs seek falls under those categories of relief that normally would be available in equity. The Third Circuit has made it clear that "courts are to analyze the underlying nature of the claim and relief requested by a plaintiff in order to determine whether that relief [has] been typically available in equity." *Skretvedt v. E.I. DuPont De Nemours*, 372 F.3d 193, 211 (3d Cir. 2004) (holding that the recovery of interest on the wrongful or delayed withholding of benefits was not a request for money damages, but a request for restitution, which would be available in equity). *See also Great-West*, 534 U.S. at 213 ("[W]hether [the remedy] is legal or equitable depends on 'the basis for [the plaintiff's] claim' and the nature of the underlying remedies sought.") (quoting *Reich v. Cont'l Cas. Co.*, 33 F.3d 754, 756 (7th Cir. 1994)).

   1.    *Restitution for Unduly Low Pension Payments Already Made to Mr. Pell*

20.    In *Great-West*, the Supreme Court held that the plaintiff's claim did not constitute equitable relief. 534 U.S. at 221. There, the plaintiff, an insurance company, sought an injunction ordering specific performance of a reimbursement provision of an ERISA plan. *Id.* at 208. The reimbursement provision granted the plaintiff the right to recover from the beneficiary any benefit payments that the beneficiary was entitled to

recover from a third party. *Id.* at 207. Although the plaintiff had recovered from a third-party tortfeasor, the Court refused to grant the injunction because ordering specific performance in the form of reimbursement would not constitute equitable relief. The Court stated that "an injunction to compel the payment of money past due under a contract, or specific performance of a past due monetary obligation, was not typically available in equity." *Id.* at 210-11.

21. *Great-West* is important in evaluating Plaintiffs' request for relief because the Court rejected the plaintiff's restitution claim, holding that it was not equitable. *Id.* at 218. The Court held that "the imposition of personal liability" for an obligation to pay money for benefits conferred was not authorized under § 502(a)(3). *Id.* at 214, 221. What the plaintiff was allowed to do under ERISA was to seek restitution in equity, "ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Id.* at 213. However, if the property a plaintiff seeks to recover has been "dissipated so that no product remains, [the plaintiff's] claim is only that of a general creditor," and the plaintiff is not able to enforce a constructive trust on the property. *Id.* at 213-14 (quoting *Restatement of Restitution* § 215, cmt. a, at 867). Thus, for a request for relief in an ERISA context to qualify as equitable, the action must not seek to impose personal liability on the defendant, but must seek to restore to the plaintiff particular funds held by the defendant. *Id.* at 214. *See also Sereboff v. Mid Atlantic Med. Servs.*, 126 S. Ct. 1869, 1874, 2006 U.S. LEXIS 3954, *12-13 (May 15, 2006) (holding that the plaintiff's

25

action properly sought equitable relief under § 502(a)(3) because the plaintiff sought recovery through a constructive trust on a specifically identifiable fund, not from the defendant's assets generally).

22.    In the action before me, Plaintiffs seek restitution for unduly low pension payments already made to Mr. Pell. (D.I. 175 at ¶ 14.) Plaintiffs claim they seek restitution in equity in the form of a constructive trust. (*Id.*) Even when money belongs in good conscience to a plaintiff, the money must be traceable "to particular funds. . .in the defendant's possession." *Great-West*, 534 U.S. at 213 (citing 1 Dan B. Dobbs, *Law of Remedies: Damages-Equity-Restitution* § 4.3(1), at 587-88 (2d ed. 1993); *Restatement of Restitution* § 160 cmt. a, at 641-42 (1936); George E. Palmer, *Law of Restitution* § 1.4, at 17 (1978)). Plaintiffs allege that the funds they seek are from "an identifiable fund. . .the amount of funds DuPont put aside to comply with ERISA funding requirements for Pensions." (D.I. 175 at ¶ 14.) However, the Plaintiffs provided no evidence that the money they seek is traceable to particular funds in the defendant's possession.

23.    The Plaintiffs' case is distinct from what the plaintiffs sought in *Sereboff*. In *Sereboff*, as in *Great-West*, the beneficiaries were covered by an ERISA plan that required the beneficiary to reimburse the fiduciary for expenses also recovered from a third party. 2006 U.S. LEXIS at *7. Soon after the beneficiaries filed a tort action, the fiduciary sent a letter to the beneficiaries' attorney, asserting a lien on the anticipated proceeds from the suit. *Id.* at *8. When the beneficiaries settled their tort suit, neither they nor their attorney sent money to the fiduciary in satisfaction of the claimed lien. *Id.*

at *8-9. After the fiduciary filed suit seeking to recover medical expenses it paid on the

beneficiaries' behalf, the fiduciary was granted a temporary restraining order and

preliminary injunction, requiring the beneficiaries to retain and set aside a portion of the

proceeds that would cover the medical expenses paid by the fiduciary. *Id.* at *9. Thus,

the fiduciary sought specifically identifiable funds, funds set aside and preserved in an

investment account, that were within the possession and control of the beneficiaries. *Id.*

at *14. In the present case, there is no evidence that the Plaintiffs seek restitution of

funds that are specifically identifiable, as was the case in *Sereboff*. Therefore, I cannot

distinguish the Plaintiffs' claim from one that would hold DuPont "personally liable,"

which is clearly prohibited by *Great-West*.[11] I am thus forced to deny Plaintiffs' request

for restitution for unduly low pension payments already made to Mr. Pell.[12]

_____

[11] This conclusion is in accordance with conclusions other courts have reached on similar facts. *See Ramsey v. Formica Corp.*, No. 1:04-CV-149, 2004 WL 1146334, at *4 (S.D. Ohio April 6, 2004) (barring plaintiff's motion for injunctive relief under § 1132(a)(3) because plaintiffs, in essence, sought money damages to recover their reliance interest in the defendant's misrepresentations about their monthly benefits); *De Pace v. Matsushita Elec. Corp. of Am.*, 257 F. Supp.2d 543, 561-62 (E.D.N.Y. 2003) ("In essence, *Great-West Life* dictates that plaintiffs' claims for compensatory payments equal to the difference between the benefits they received and those they were promised is not a viable remedy under § 1132(a)(3). . .since they seek no more than compensation for loss resulting from the defendant's breach of legal duty."); *Kishter v. Principal Life Ins. Co.*, 186 F. Supp.2d 438, 446 (S.D.N.Y. 2002) (denying plaintiff's claim for recovery under § 1132(a)(3) for money the plaintiff lost when the employer did not provide the plaintiff with complete and accurate information about her life insurance policy).

[12] In denying this aspect of Plaintiffs' claim, I share the frustration expressed by the court in *Matsushita* because of the Supreme Court's decision in *Great-West*. In *Matsushita*, the court stated that there appeared to be no ERISA-related purpose for denying plaintiffs a "make-whole" remedy when a fiduciary induced an employee to participate in a voluntary resignation program by giving misleading information about pension benefits. 257 F. Supp. at 563. The court lamented, "it seems utterly absurd that plaintiffs who have been defrauded into signing ERISA contracts would lack any

27

2.    *Injunction for Future Benefits*

24.    Plaintiffs seek an injunction to compel DuPont to use February 10, 1971 in calculating Mr. Pell's benefit rights under the pension plan. (D.I. 175 at ¶ 14.) Although an injunction is a category of relief typically available in equity, I must "analyze the underlying nature of the. . .relief requested by a plaintiff in order to determine whether that relief [has] been typically available in equity." *Skretvedt*, 372 F.3d at 211. Unlike the restitution relief Plaintiffs seek, I conclude that the injunction to compel DuPont to use an earlier date to calculate future benefits under the DuPont Plan is an appropriate equitable remedy under ERISA ¶ 502(a)(3), but the correct date for that purpose is the August 1, 1972 date in Mr. Waddell's Letter to Mr. Pell, which was the linchpin of Mr. Pell's original decision to transfer to DuPont.

25.    The Supreme Court in *Great-West* suggested that courts consult standard works "such as Dobbs, Palmer, Corbin, and the Restatements" to understand the basic

---

recognizable recompense. . . ." *Id.* While the issue here is not fraud, DuPont is responsible for repeatedly misleading the Pells. Despite that, the Pells are left without a remedy for past shortfalls in the pension benefits they had been told they could expect. This turns the notion of equity on its head, allowing the wronged to be deprived of a remedy.

It seems odd to conclude that Congress would designate backpay as a type of equitable relief available for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(g)(1) (stating that courts may award "appropriate. . .equitable relief," including "reinstatement or hiring of employees, with or without back pay"), but only recognize restitution as a form of equitable relief for violations of ERISA if the money plaintiffs seek is traceable to specific funds. *See Great-West*, 534 U.S. at 213. Nevertheless, the Supreme Court directly addressed this issue in *Great-West*. The Court concluded that when Congress allowed plaintiffs to recover backpay under Title VII, it did not intend that all restitution be considered a form of equitable relief . Rather, the Court reasoned that "Congress 'treated [backpay] as equitable' in Title VII only in the narrow sense that it allowed backpay to be awarded *together with* equitable relief." *See id.* at 218 n.4 (internal citations omitted).

28

contours of the term "equitable relief."  534 U.S. at 217.  In *Law of Remedies*, Dobbs

describes estoppel as "purely substantive equity."  Dan B. Dobbs, 1 *Law of Remedies* §

2.3(5), at 84 (2d ed. 1993).  Dobbs defines "estoppel" as stopping someone "from

claiming or saying something; usually. . .from saying the truth or claiming a lawful claim,

and usually this is because of some prior inconsistent statement or activity."  *Id.*

"Equitable estoppel" is used to "prevent one person from gaining advantage over

another by misleading conduct" when a person uses "acts or words that operate like

representations of fact."  *Id.* at 86, 87.  That definition is in accord with the definition of

equitable estoppel adopted by the Third Circuit.  The Third Circuit has stated:

> [T]he doctrine of equitable estoppel operates to preclude a party who has
> made representations of fact through his words or conduct from asserting
> rights which might perhaps have otherwise existed as against another
> person, who has in good faith relied upon such conduct, and has been led
> thereby to change his position for the worse. . . .

*Gibbs ex rel. Gibbs v. Carnival Cruise Lines*, 314 F.3d 125, 133 (3d Cir. 2002) (quoting

*Oxford Shipping Co., Ltd. v. N.H. Trading Corp.*, 697 F.2d 1, 4 (1st Cir. 1982).

        26.      As Plaintiffs have met the elements of their equitable estoppel claim, it is

appropriate to estop DuPont from asserting its right to rely on the terms of the DuPont

Plan as a basis for asserting that Mr. Pell's adjusted service date is November 1, 1975.

Estopping DuPont from enforcing the terms of their plan as to Mr. Pell's service date is

appropriate because it prevents DuPont from gaining an advantage over Mr. Pell

through its repeated misrepresentations over a period of several years.  It is, in short,

appropriate to hold DuPont to the terms of the plan as DuPont itself represented them

to Mr. Pell when he made the decision to transfer, namely that his adjusted service date is August 1, 1972.[13]

27.    Enforcing an injunction to compel DuPont to use August 1, 1972 in calculating Mr. Pell's benefit rights under the pension plan is appropriate equitable relief under ERISA § 502(a)(3). Plaintiffs do not seek compensatory damages; they only seek to compel DuPont to enforce the terms of the plan as DuPont represented them to Mr. Pell over the years, which is in accordance the Supreme Court's interpretations of § 502(a)(3).

## IV.    SUMMARY OF CONCLUSIONS

28.    For the reasons set forth herein, I conclude that Plaintiffs have succeeded under an equitable estoppel theory of relief, establishing that DuPont made material misrepresentations, that Plaintiffs reasonably and detrimentally relied upon those misrepresentations, and that extraordinary circumstances exist to warrant relief. I also conclude that Plaintiffs' request for restitution for unduly low pension payments already made to Mr. Pell is not permitted under ERISA § 502(a)(3), as interpreted by the Supreme Court, but that an injunction to compel DuPont to recognize and use August 1, 1972 in calculating Mr. Pell's future benefits under the pension plan from this time forward is appropriate. Accordingly, I will enter an injunction against DuPont's refusal to

---

[13] While it is true that DuPont on several occasions told Mr. Pell his adjusted service date would be February 10, 1971, Mr. Pell should have known that was at odds with the assurance he received in the Letter from Mr. Waddell and with the terms of the Consol Plan, under which he knew his benefits were calculated as beginning August 1, 1972. His stated object from the beginning of his investigation of the potential transfer from Consol to DuPont was to not lose time to be credited toward his pension. (*See* F.F. 10.) Equity does not require that he be given more time than that with which he would have been credited had he remained with Consol.

calculate and pay Plaintiffs' monthly pension benefit using that date. An appropriate

order will follow, requiring the parties to confer and submit within ten days a form of

judgment giving effect to these conclusions.